AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

05/10/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

5/10/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ D.C. _____ DEPUTY

UNITED STATES OF AMERICA,

v.

EDUARDO VALENCIA,

Defendant.

Case No.  5:23-mj-00237

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 6, 2023 in the county of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(C) | See attached affidavit |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Pursuant to Fed. R. Crim. P. 4.1
*Complainant's signature*

ATF Special Agent, Amanda Renteria
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     5/10/23

*Judge's signature*

City and state:   Riverside, California

Honorable Shashi H. Kewalramani, U.S. Magistrate Judge
*Printed name and title*

AUSA: John A. Balla (951-276-6246)

## AFFIDAVIT

I, Amanda Renteria, being duly sworn, declare and state as follows:

### I. BACKGROUND OF AFFIANT

1. I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, and have been so employed since September 2020. I am currently assigned to the San Diego II Field Office located in San Diego, California. As an ATF SA, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations of, and to make arrests for, offenses contained in Title 18, United States Code, Section 2516, Title 26 of the United States Code, and Title 21 of the United States Code.

2. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy in Glynco, Georgia. The training for the two programs was approximately 28 weeks and included training on conducting investigations into federal criminal violations related to firearms, arson, explosives, narcotics, and money laundering; identification of firearms; identification of controlled substances; physical and electronic surveillance; undercover operations; controlled purchases; and interdiction. I have also attended numerous hours of additional training on various investigative techniques and resources.

3. During my career in law enforcement, I have personally conducted and/or assisted in investigations of criminal acts

involving Title 18, United States Code, Section 922(a)(1)(A) (dealing of firearms without a license); Title 18, United States Code, Section 371 (conspiracy to deal firearms without a license); Title 26, United States Code, Section 5861(d) (possession of unregistered NFA weapon); and Title 21, United States Code, Section 841 (possession of controlled substance with intent to distribute).  As part of those investigations, I have conducted or personally participated in both physical and electronic surveillance.  I have been involved in the execution of search and arrest warrants.  I have conducted and personally participated in debriefing defendants, co-conspirators, and witnesses that have been involved in the unlawful possession, sale, and distribution of firearms and controlled substances. Through these investigations, I have also gained experience working directly with confidential informants and sources of information.

4.    Through my training, education, and experience, I have become familiar with the manner in which members of a criminal enterprise communicate, contact each other, and use electronic communications to store, transmit, and distribute information to one another and how they plan, organize, and carry out their criminal activities.  I have become familiar with the movements of individuals trafficking in illegal drugs and weapons and those suspected of committing violent crimes while trafficking in illegal drugs and weapons.

## II. <u>PURPOSE OF AFFIDAVIT</u>

5.   This affidavit is made in support of an application for a criminal complaint against and arrest warrant for Eduardo VALENCIA for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Distribution of Cocaine) on April 6, 2023.

6.   This affidavit is also made in support of an application for a warrant to search 5789 Marlatt Street, Mira Loma, California 91752, (the "SUBJECT PREMISES") as described in Attachment A-1, for the items to be seized in Attachment B, which are evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846 (Distribution, Possession with Intent to Distribute, and Conspiracy to Distribute Controlled Substances) and 18 U.S.C. §§ 922(a)(1)(A) (Dealing in Firearms Without a License) and 922(o) (Possession of Machineguns) and 26 U.S.C. § 5861(d) (Possession of Unregistered Firearms) (the "SUBJECT OFFENSES") as described in Attachment B.  Attachments A-1 and B are incorporated herein by reference.

7.   This affidavit is also made in support of an application for a warrant to search the person of Javier Mauricio ESQUIVEL, as described further in Attachment A-2, for the items to be seized in Attachment B, which are fruits, evidence, or instrumentalities of the SUBJECT OFFENSES. Attachments A-2 and B are incorporated herein by reference.

8.   Finally, this affidavit is made in support of an application for a warrant to search the following vehicles, as described in Attachments A-3 and A-4 (collectively, the "SUBJECT VEHICLES"), for the items to be seized in Attachment B, which

3

are evidence, fruits, or instrumentalities of the SUBJECT
OFFENSES:

> a.   a grey 2021 BMW, bearing California license plate
8XEC948 and VIN 3MW5R1J07M8C03766 ("SUBJECT VEHICLE 1"); and

> b.   a maroon 2016 Nissan Altima, bearing temporary
California license plate CF54C86 and VIN 1N4AL3AP8GN377591
("SUBJECT VEHICLE 2").

Attachments A-3, A-4, and B are incorporated herein by
reference.

9.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, my review
of official reports, and information obtained from various law
enforcement personnel and witnesses. This affidavit is intended
to show merely that there is sufficient probable cause for the
requested complaint, arrest warrant, and search warrants, and it
does not purport to set forth all of my knowledge of or
investigation into this matter. Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

10.   Over the last six months, ATF has purchased cocaine,
ghost guns, and machineguns from VALENCIA during five controlled
purchases in Riverside and San Diego, California.

11.   Surveillance following the controlled purchases and
location data obtained from a ping warrant show that VALENCIA
lives at the SUBJECT PREMISES.  Additionally, VALENCIA drove a
rental car to four of the controlled purchases, and he listed

the SUBJECT PREMISES as his address on his application to rent the car.

12.   VALENCIA drove SUBJECT VEHICLE 1 to one of the controlled purchases.  Surveilling agents have also seen SUBJECT VEHICLE 1 parked at the SUBJECT PREMISES at various times and as recently as May 9, 2023.

13.   ESQUIVEL accompanied VALENCIA to four of the five controlled purchases.  During the controlled purchases, ESQUIVEL helped VALENCIA retrieve some of the items sold to undercover agents.  Surveillance after one of the controlled purchases showed that ESQUIVEL drove with VALENCIA back to the SUBJECT PREMISES.  ESQUIVEL then left the SUBJECT PREMISES in SUBJECT VEHICLE 2.  In my training and experience, this is consistent with ESQUIVEL being a source of supply for VALENCIA for drugs and/or firearms.  Though I do not seek a criminal complaint against ESQUIVEL at this time, I seek warrants to search his person and SUBJECT VEHICLE 2 to find, among other things, his cellular phone containing records to confirm his active involvement in (as opposed to mere presence at) the controlled purchases herein and/or other firearm and drug trafficking.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

14.   Beginning in July 2022, an ATF undercover SA ("UC") was reviewing Instagram profiles of individuals suspected to be involved in the criminal possession of and/or use of firearms. While reviewing various profiles, the UC saw an Instagram profile with the name of "don_joker47" (later identified as

5

VALENCIA[1]).  The UC saw several photographs and videos posted to the account depicting the same individual possessing firearms, including one with a suspected silencer attached, and holding large amounts of United States currency.

15.  Between July and November 2022, the UC and VALENCIA communicated via Instagram direct messages.[2]  During conversation, VALENCIA indicated that he was interested in installing a hidden compartment in his 2018 Chevy Silverado pickup truck.[3]  The UC inquired as to how VALENCIA makes his money, to which he replied, "Little bit of everything."  As the conversation continued, the UC arranged to have VALENCIA meet with him at an ATF Riverside controlled UC location[4] in the evening of November 3, 2022, to discuss the hidden compartment.

---

[1] Agents identified VALENCIA during the first controlled purchase discussed herein.  As described below, UCs met with VALENCIA under the guise of installing a hidden compartment in VALENCIA's vehicle.  While inside the vehicle, one of the UCs noticed a receipt bearing the name "Eduardo Valencia."  The UC also noticed that VALENCIA had a tattoo of his last name.  After the controlled purchase, agents queried law enforcement databases for an Eduardo Valencia with VALENCIA's approximate age range, and they found a previous booking photo for VALENCIA that matched the person with whom the UCs met during the controlled purchase.

[2] All the UC's communications with subjects of this investigation, whether through Instagram, text message, or telephone call, were recorded and preserved, and I have reviewed all the communications.

[3] In my training and experience, drug and firearm traffickers use hidden compartments in vehicles to transport drugs and firearms to avoid law enforcement detection.

[4] The UC Riverside location is a controlled location that ATF has built to look like a legitimate business. The location is equipped with high-quality audio and video surveillance equipment that records each room of the location whenever agents conduct controlled purchases inside. The location also has areas where agents covertly remain inside and view the audio and video

*(footnote cont'd on next page)*

**A.   First Controlled Purchase of Cocaine from VALENCIA on November 3, 2022**

16.   On November 3, 2022, UCs and VALENCIA met at the Riverside UC location within the Central District to discuss installing a hidden compartment in his vehicle.  Throughout the conversation, VALENCIA stated he is involved in the sales of cocaine.  VALENCIA further advised that he could sell a kilogram of cocaine for $20,000.  VALENCIA then proceeded to take out a glass container from a brown satchel he was wearing.  VALENCIA opened the container and indicated that it was approximately one ounce of cocaine inside the jar.  The UCs stated they were interested in purchasing the cocaine, to which VALENCIA stated he would need to weigh it first.  VALENCIA proceeded to weigh the cocaine on a digital scale, which he brought with him to the UC location.  Due to weight of the cocaine being less than one ounce, VALENCIA agreed to sell it for a discounted price of $640.

17.   Throughout conversation, VALENCIA told the UCs that he has an associate who smuggles controlled substances into the United States.  VALENCIA advised the UCs that he would need at least a day's advance notice if the UCs "ordered" a kilogram or more of cocaine for purchase.  Additionally, VALENCIA stated he previously transported one pound of fentanyl to Colorado.

---

feeds in real time during controlled purchases.  When an ATF UC conducts controlled purchases in the location, other agents also remain outside around the building and conduct surveillance.  I have reviewed the audio and video surveillance depicting the controlled purchase at the UC Riverside location and spoken with the UCs and surveilling agents about the purchase.

**B.    Second Controlled Purchase of Cocaine from VALENCIA on March 7, 2023**

18.    Between November 3, 2022, and March 7, 2023, the UC and VALENCIA exchanged direct messages via Instagram. The UC and VALENCIA discussed the following, in substance:

a.    In December 2022, VALENCIA sent a photograph which depicted a gold-plated Draco pistol.  VALENCIA offered to sell the pistol for $16,000 to the UC.

b.    In February 2023, VALENCIA offered to sell the UC cocaine for $700 an ounce.  Through negotiations, VALENCIA agreed to sell an ounce of cocaine for $650 if the UC purchased more than two ounces at a time.

c.    On March 6, 2023, the UC negotiated the purchase of four ounces of cocaine for $2,400.  The UC and VALENCIA agreed to meet the following day at an ATF San Diego UC location[5] in the Southern District of California.

d.    On March 7, 2023, VALENCIA sent a message via Instagram to the UC stating he had six ounces of cocaine for sale instead of the four ounces originally agreed upon.  The UC agreed to purchase the six ounces of cocaine for $3,500.

19.    Later on March 7, 2023, UCs and VALENCIA met at the UC San Diego location to conduct the transaction.  VALENCIA was

---

[5] The UC San Diego Location is the same in all material respects as the UC Riverside location discussed above.  In addition to viewing the audio and video surveillance of the controlled purchases at the UC San Diego Location and speaking with the involved UCs, I was also present on surveillance during the purchases at the UC San Diego location discussed below.

driving SUBJECT VEHICLE 1[6] and was accompanied by a man later
identified as ESQUIVEL.[7]  During the controlled purchase,
VALENCIA stated that he had sold the gold-plated Draco pistol
for $10,000.  VALENCIA stated he could acquire firearms for sale
and that an associate could acquire "P80s all day" (P80s is a
slang term referring to privately made firearms ("PMFs")).
Additionally, VALENCIA stated he has eight Rock Island pistols
that he obtained from an associate who burglarized an "armory"
on a train.  VALENCIA refused to sell any of the Rock Island
pistols but did show the UCs photographs and videos on his
cellphone of the Rock Island pistols and a suspected machinegun.

20.  VALENCIA indicated that if the UCs did not care if the
firearms they purchase were stolen or used, VALENCIA could
acquire firearms for sale "all day."  VALENCIA advised that he
used to have an associate who worked on Camp Pendleton who used
to be able to acquire grenades for sale.  VALENCIA discussed an

---

[6] A records check showed that SUBJECT VEHICLE 1 is
registered to "Manuel Acosta" at an address in Colton,
California.  In my training and experience, it is common for
drug and firearm traffickers to register cars in names and at
addresses other than their own.

[7] Agents identified ESQUIVEL during the fifth controlled
purchase discussed herein.  After the controlled purchase,
surveillance agents saw ESQUIVEL exit the Jeep and enter SUBJECT
VEHICLE 2.  SAs queried law enforcement databases for the
temporary tags which revealed ESQUIVEL's name and residential
address.  Based on a Department of Motor Vehicles driver's
license photograph, the UCs confirmed ESQUIVEL was the same
individual who accompanied VALENCIA to the second through fifth
controlled purchases.  ESQUIVEL's California driver's license
lists his address as 4960 Rutile Street, Riverside, California
92509, so I believe he resides in the Central District of
California.

associate of his who used to sell large quantities of firearms and was the firearms source for much of the area where he lives.

21.  In total, the UCs purchased the following from VALENCIA on March 7, 2023:

a.  173.3 grams of cocaine, as confirmed by DEA laboratory analysis.



**C.    Third Controlled Purchase of Cocaine and Firearms from VALENCIA on March 13, 2023**

22.  On March 8, 2023, VALENCIA contacted the UC via Instagram direct message and asked for the UC's telephone number.  VALENCIA sent the UC a text message utilizing the phone number (951) 594-3664, stating, "It's me joker."  Between March 8, 2023, and March 13, 2023, the UC and VALENCIA communicated via recorded calls and text messages utilizing the UC's cellular telephone and VALENCIA's cellphone.  The UC and VALENCIA discussed the following, in substance:

a.  On March 8, 2023, the UC stated he wished to purchase three PMF pistols from VALENCIA.  VALENCIA quoted the

UC $950 per pistol, which included the delivery fee. Additionally, the UC agreed to purchase nine ounces of cocaine for $5,150 from VALENCIA.

b.   On March 13, 2023, the UC and VALENCIA exchanged text messages regarding firearms and the cocaine for purchase. VALENCIA informed the UC that the PMF pistols were sold to another individual but agreed to sell the UC three privately made AR-variant firearms and the cocaine the same day.

23.   Later on March 13, 2023, VALENCIA met the UCs at the UC location in San Diego to conduct the transaction.   VALENCIA was driving a black Jeep Compass[8] and was accompanied by ESQUIVEL.   VALENCIA and ESQUIVEL unloaded three privately made AR-variant firearms from the trunk of the Jeep.   The firearms included one privately made AR-variant rifle, one privately made AR-variant short-barreled rifle, and one privately-made machinegun pistol.   VALENCIA stated the privately made machinegun pistol "once in a while . . . goes fully" (in reference to fully automatic) and acknowledged that he knew there was a sear inserted in the pistol to make it capable of shooting fully automatic.   Additionally, VALENCIA acknowledged that he knew that the end of the privately made AR-variant short barrel rifle had been cut.

24.   VALENCIA retrieved a clear plastic bag containing nine smaller packages, each containing one ounce of cocaine, from the

---

[8] Records checks showed that the Jeep Compass was owned by Enterprise Rent-A-Car.  An inquiry with Enterprise showed that VALENCIA was the listed renter from March 13, 2023, until he returned the car on April 10, 2023.  On his rental application, he listed the SUBJECT PREMISES as his address.

driver's area of his vehicle.  The UCs purchased the nine ounces of cocaine for $5,000.

25.  During the transaction, VALENCIA advised that his associate who has AR-15-variant rifles for sale has "guaranteed fullys" that sell for $2,000 each.  VALENCIA told the UCs that he has an associate who sells plastic "switches" (referring to machine gun conversion devices ("MCDs"), commonly called Glock switches or switches on the street[9]).  VALENCIA indicated that he has used one of the "switches" attached to a Glock pistol and advised that they function properly.

26.  In total, the UCs purchased the following from VALENCIA on March 13, 2023:

    a.  271.9 grams of cocaine, as confirmed by DEA laboratory analysis;

    b.  One privately made AR variant rifle;

    c.  One privately made machinegun pistol; and

---

[9] MCDs are devices that can convert a Glock-type handgun to fire automatically, and thus the switches themselves are classified as "machineguns."  See 26 U.S.C. § 5845(b) ("The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include . . . any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." (emphasis added)).  They are illegal to possess under 18 U.S.C. § 922(o), and they are highly dangerous.

     d.   One privately made AR-variant short-barreled rifle.[10]

 

**D.  Fourth Controlled Purchase of Cocaine and Firearms from VALENCIA on March 15, 2023**

27.  Between March 13, 2023, and March 15, 2023, the UC and VALENCIA exchanged text messages and recorded phone calls.  The UC and VALENCIA discussed the following, in substance:

a.  VALENCIA advised that he obtained sixteen MCDs from an associate.  During a phone call, VALENCIA advised that the sale price of the MCDs would be $150 each.  VALENCIA offered to sell the UC the following: one privately made pistol, one privately made pistol with a MCD installed, one Glock pistol, a short-barreled rifle, and the sixteen MCDs, which the UC agreed to purchase.  The UC and VALENCIA agreed to meet on March 15, 2023, to conduct the controlled purchase.

---

[10] I measured the barrel length and determined that the barrel is approximately 11.5 inches long with the bolt closed and approximately 31 inches overall length , making it a short-barreled rifle under 26 U.S.C. § 5845(a)(3).

28.   On March 15, 2023, the UCs met VALENCIA at the UC San Diego location to conduct the transaction.  VALENCIA was driving the Jeep and was accompanied by ESQUIVEL.

29.   VALENCIA unloaded the firearms from the trunk of the Jeep and handed them to the UCs.  VALENCIA also removed a small plastic bag from the trunk area, which contained the sixteen MCDs.  VALENCIA stated that his MCD source could also obtain metal MCDs.  VALENCIA proceeded to conduct a function test on the privately made pistol with the MCD installed and the other privately made pistol to demonstrate the difference between a fully automatic and semi-automatic firearm.  Additionally, VALENCIA explained how to install a MCD onto a Glock-type pistol to the UCs.  VALENCIA told the UCs he has been obtaining firearms for sale regardless of the UCs placing an order or not.

30.   In total, the UCs purchased the following from VALENCIA on March 15, 2023:

        a.   One privately made pistol;

        b.   One Glock pistol, model 26 Gen4, 9mm, bearing serial number XPW022;

        c.   Sixteen MCDs;

        d.   One privately made pistol with an MCD installed; and

14

e.    One privately made AR-variant short-barreled rifle.[11]



**E.    ATF Analysis of Machineguns**

31.  A firearms enforcement officer ("FEO") with the ATF Firearms Technology Criminal Branch ("FTCB"), trained and experienced in determining whether firearms fall under the National Firearms Act ("NFA"), tested, and examined the suspected machineguns and MCDs from the March 13 and 15 controlled purchases.  The FEO issued a report stating that he test-fired the two suspected machineguns and partially disassembled the firearms to examine them.  He determined that the suspected machineguns shot more than one round of ammunition

---

[11] I measured the barrel length and determined that the barrel is approximately 9 inches long with the bolt closed and the overall length is approximately 27.5 inches, making it a short-barreled rifle under 26 U.S.C. § 5845(a)(3)

with a single pull of the trigger, and he thus opined that they are "machineguns" as defined in 18 U.S.C. § 921(a)(24), and 26 U.S.C. § 5845(b).

32.   Additionally, the FEO examined and test-fired the sixteen MCDs.  The FEO determined that the suspected MCDs converted a semiautomatic pistol into a machinegun.  Once the MCD was installed on a semiautomatic pistol, it expelled more than one round of ammunition with a single pull of the trigger, and he thus opined that they are "machineguns" as defined in 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b).

   **F.   Fifth Controlled Purchase of Cocaine and a Firearm from VALENCIA on April 6, 2023**

33.   Between March 15, 2023, and April 6, 2023, the UC and VALENCIA exchanged text messages and recorded phone calls.  The UC and VALENCIA discussed the following, in substance:

34.   On March 21, 2023, VALENCIA contacted the UC via text message utilizing the phone number (916) 827-6315, stating "It's me joker this my new cell."  Previously on March 8, 2023, VALENCIA sent a text message to the UC, providing the phone number (951) 594-3664, to the UC and stated, "It's me joker." The UC has not communicated with any other subject that goes by the name "joker" via telephone.

35.   On March 25, 2023, VALENCIA sent the UC a message asking if the UC wanted another "9 pack" (9 ounces of cocaine). On March 28, 2023, the UC placed a telephone call to VALENCIA and stated he was interested in purchasing methamphetamine.  The

following day, VALENCIA stated he only had cocaine available for purchase.

36.   On April 4, 2023, VALENCIA offered to sell the UC an AR-variant rifle for $1,700.  After a brief negotiation, VALENCIA agreed to lower the sale price to $1,600.  During further messages and calls, the UC arranged to purchase nine ounces of cocaine and the AR-variant rifle from VALENCIA at the Riverside UC location.

37.   On April 6, 2023, members of the ATF Riverside Field Office and the UCs met at the Riverside UC location and set up surveillance in the area.

38.   At approximately 5:15 PM, surveillance saw VALENCIA driving the Jeep near the UC location, accompanied by ESQUIVEL. VALENCIA drove the Jeep into the garage of the UC location in order to conduct the transaction.

39.   Once inside the UC location, VALENCIA retrieved the privately made AR-variant rifle from the trunk of the Jeep. After inspection of the rifle, the UCs advised that the rifle appeared to be "short," which VALENCIA and ESQUIVEL acknowledged.  Shortly after, VALENCIA retrieved suspected cocaine wrapped in plastic from the dashboard area near the driver seat of the Jeep.  Additionally, VALENCIA instructed ESQUIVEL to retrieve a 30-round ammunition magazine from the Jeep.

40.   During conversation, the UCs inquired about purchasing larger amounts of cocaine from VALENCIA.  VALENCIA quoted a sale

price of $18,000-$18,500 for a kilogram of cocaine and $9,500 for a half of a kilogram of cocaine.

41.  VALENCIA advised that he does not know the identities of the people he acquires his cocaine from.  He advised if the UCs wanted to purchase a kilogram of cocaine, they would have to purchase the kilogram of cocaine directly from people associated with his source of supply.

42.  After the transaction concluded, surveillance units saw VALENCIA and ESQUIVEL exit the UC location in the Jeep. Surveillance units followed the Jeep until they saw the Jeep arrive at and park outside of the SUBJECT PREMISES.  VALENCIA exited the Jeep and entered the SUBJECT PREMISES.  ESQUIVEL entered SUBJECT VEHICLE 2, which was parked outside of the SUBJECT PREMISES.  Shortly after, surveillance units saw ESQUIVEL park SUBJECT VEHICLE 2 outside of a residential address of 4960 Rutile Street, Riverside, CA 91752, which is approximately 2 miles away from the SUBJECT PREMISES.  In my training and experience, this travel pattern after the controlled purchase and ESQUIVEL's presence at the controlled purchases is consistent with ESQUIVEL supplying VALENCIA with the firearm and/or cocaine sold during the controlled purchase. Drug or firearm sources will often attend a drug or firearm sale brokered by another person to confirm that the sale occurred and confirm the sale price.

43.  In total, the UCs purchased the following from VALENCIA on April 6, 2023:

a.  Approximately 332 grams of suspected cocaine,

awaiting analysis by DEA; and

       b.   One privately made AR-variant short-barreled rifle.[12]



## G. ATF Records Query of VALENCIA and ESQUIVEL

44.   After the fifth controlled purchase, I conducted a query of both VALENCIA and ESQUIVEL and determined that there was no identifiable record for either subject within the National Firearm Registration and Transfer Record.

45.   Additionally, there was no identifiable record for either of the subjects within the Federal Licensing System as a current, former, or pending applicant/licensee to deal firearms.

## G. Surveillance

46.   The SUBJECT PREMISES is .48 acre lot with a single family dwelling with the address of 5789 Marlatt Street, Mira

---

[12] ATF SA Valerie Atwood measured the barrel length and determined that the barrel is approximately 12 inches long with the bolt closed and the overall length is approximately 27 inches, making it a short-barreled rifle under 26 U.S.C. § 5845(a)(3).

Loma, California 91752.[13]  Through physical surveillance, phone locations pings and use of a cell-site simulator, ATF agents have determined VALENCIA utilized SUBJECT PREMISES to facilitate firearms and narcotics trafficking.

47.   To determine VALENCIA's location, I obtained a GPS ping warrant for his phone number mentioned above on March 28, 2023, in the United States District Court for the Central District of California, issued by United States Magistrate Judge Sheri Pym.  On March 29, 2023, I received the first GPS pings showing VALENCIA in and around Mira Loma, California.  On March 31, 2023, the records were received via electronic mail.  The GPS pings will terminate on May 12, 2023.

48.  I reviewed the GPS phone pings and determined that VALENCIA's phone location pings have consistently shown VALENCIA in the general area of the SUBJECT PREMISES.  I queried the address in law enforcement databases that comb records like utilities and credit applications, and I determined that the SUBJECT PREMISES was associated with VALENCIA.

49.  On March 18, 2023, SA Atwood conducted surveillance at the SUBJECT PREMISES.  SA Atwood saw the Jeep parked in the driveway of the residence.  Additionally, SA Atwood observed SUBJECT VEHICLE 1 parked behind the residence.

50.  On May 8 and 9, 2023, SA Atwood again conducted surveillance at the SUBJECT PREMISES.  SA Atwood SUBJECT VEHICLE 1 parked in the driveway of the SUBJECT PREMISES both days.  On

---

[13] This information was obtained from public records search on the County of Riverside Assessor, County Clerk, Recorder website.

May 8, 2023, SA Atwood saw a man vacuuming the inside of SUBJECT VEHICLE 1.  The man's appearance was consistent with VALENCIA, but SA Atwood was not close enough to confirm whether it was him.

51.  On May 8, 2023, SA Atwood conducted surveillance at 4960 Rutile Street, Riverside, California 92509, ESQUIVEL's driver's license address and the address where he traveled after the fifth controlled purchase.  SA Atwood saw SUBJECT VEHICLE 2 parked in the driveway of the residence.

V.  **TRAINING AND EXPERIENCE ON FIREARM AND DRUG TRAFFICKING**

52.  Based upon my training and experience, consultation with other law enforcement officers experienced in firearms and drug investigations, and all the facts and opinions set forth in this affidavit, I believe that probable cause exists that the SUBJECT PREMISES and the SUBJECT VEHICLES are being used to further the distribution of firearms and controlled substances by VALENCIA and ESQUIVEL.

53.  In addition, I know that:

a.  Individuals involved in firearms and narcotics trafficking often maintain the following items in their residences and vehicles: firearms, firearms parts and accessories (including but not limited to magazines, spare parts for firearms, and gun cases), ammunition, parts, tools, and machinery used to assemble, manufacture, modify, or convert firearms (including, but not limited to, jigs, mills, lathes, Computer Numerical Control (CNC) machinery, drills, drill presses, and drill bits), explosives powders used in the

construction of ammunition, controlled substances and paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances. They will commonly have this contraband on hand, secreted at their premises or on their person or in their vehicle. The manufacturing and selling of such contraband are an ongoing type of business. It takes time to develop clientele, develop skills in manufacturing and/or converting firearms, and collect serialized firearms from various locations to sell. As it relates to narcotics trafficking, the nature of drug abuse requires a steady supply. Both firearms and narcotics trafficking tend to be very lucrative. They also have "fruits" of their illegal sales on hand, including United States currency and other valuables.

> b.   Individuals involved in firearms and narcotics trafficking often maintain records of their firearms and narcotics transactions and other records of evidentiary value for months or years at a time. It is common, for example, for firearms and narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time even after the debts are collected. Based on conversations with other agents, I have learned that such records are invaluable to narcotics traffickers and that such records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets also frequently

include the names, identities and telephone numbers of suppliers, customers, and coconspirators.

        c.   Based on my training and experience, I know that firearms traffickers will also keep additional documents and packaging related to firearms transactions, including purchases of firearms parts and accessories.  I know that firearms and narcotics traffickers will keep photographs, videos, and other documentation related to firearms and narcotics trafficking. These can be kept in handwritten, typed, photocopied, or printed form or stored in some other electronic form, including magnetic, electronic, or optical storage device capable of storing data, such as cell phones, laptops, computers, tablets, printers, external hard drives and thumb drives, and personal digital assistance.

        d.   Individuals involved in firearms and narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residence and their vehicles.  The identities can be found in receipts, telephone records and bills, address books, distribution lists, customer lists, firearm supplier lists, price lists, bank statements, letters, write transfer receipts, firearm and/or narcotics ledgers, letters and other correspondence, lists of firearms acquired and disposed of, records related to travel for participating in firearms or narcotics trafficking conspiracy (including but not limited to airline, train, or bus tickets, hotel and restaurant receipts,

gas receipts, rental vehicle receipts, passports, and credit card receipts) and other records related to sale, purchase, transfer, or possession of firearms and/or narcotics.

e.   Individuals involved in firearms and narcotics trafficking often utilize stash houses and vehicles to store firearms and illegal narcotics; manufacture and/or convert firearms; weigh, cut and package the illegal narcotics; store firearms and narcotics proceeds, and/or store information relating to their firearm and/or drug trafficking business.

f.   Individuals involved in firearms and narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, vehicles, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences of individuals involved in narcotics and firearms trafficking.

g.   Individuals involved in firearms and narcotics trafficking often keep and maintain large amounts of United States currency at their residences and in their vehicles. Such funds are often used for every-day expenditures and to maintain and finance their ongoing narcotics business.

h.   Additionally, individuals involved in firearms and narcotics trafficking often amass and maintain assets at their residence which were generated by their trafficking activities or purchased with the cash earned from such trafficking.

i.   Individuals involved in firearms and narcotics trafficking often maintain weapons, firearms, and ammunition on their person or in their residence and/or vehicles.  Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms.  Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms, and profits, as well as for enforcement purposes during their narcotics and firearms dealings.

j.   Residences, premises, and vehicles used by individuals involved in firearms and narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting, or controlling the residence, vehicles, and premises.

k.   Individuals involved in firearms and drug trafficking often maintain cellular telephones at their residence, residence of associates, places of business, in their vehicle, and/or on their person for the purpose of arranging transactions. Persons attempting to arrange for the sale, purchase, transportation, and manufacture of controlled

substances frequently will contact their illegal business customers, purveyors, and associates to negotiate business deals.  Further, it has been my experience that those involved in firearms and drug trafficking maintain contact information for other co-conspirators in their cellular telephones.  In particular, there is probable cause to believe that the following may be found stored in cellular telephones at the SUBJECT PREMISES, on ESQUIVEL's person, or in/on the SUBJECT VEHICLES:  Electronic records, communications, web searches, and data including, but not limited to emails, text messages, photographs, audio files, videos, and location data, on digital devices:

       i.   tending to identify efforts to possess or distribute controlled substances or the illegal possession, manufacture, conversion, or sale of firearms;

       ii.   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate efforts to possess or distribute controlled substances or the possession, manufacture, conversion, or sale of firearms;

       iii. tending to identify co-conspirators, criminal associates, or others involved in possessing or distributing controlled substances or manufacturing, converting, or selling firearms;

       iv.   tending to identify travel to or presence at locations involved in the possession or distribution of controlled substances or the illegal possession, manufacturing,

converting, or sale of firearms, such as stash houses, load vehicles, or delivery points;

      v.  tending to identify the user of, or persons with control over or access to, the digital devices; and/or

      vi.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

54.  It is also my opinion and belief that the above-described documents are currently possessed by firearms and narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by firearms and narcotics dealers whether or not the dealer is in possession of any firearms, drugs, or chemicals at any given moment.

    2.  **TRAINING & EXPERIENCE ON DIGITAL DEVICES[14]**

55.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[14] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   A person who connects to the Internet must use a computer or mobile device, such as a tablet or wireless/cellular telephone, to facilitate that access.  Furthermore, in my training and experience, these devices typically travel with a subject or remain in SUBJECT PREMISES.  It is therefore reasonable to believe that computers, tablets, wireless telephones, and other electronic storage media may be present in SUBJECT PREMISES.  Further, because it is possible to store certain mobile devices, such as removable storage media and wireless telephones, in a pocket, it is reasonable to believe that mobile devices may be found on the persons.

b.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

c.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

d.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

e.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

f.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

g.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

h.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## VI.   CONCLUSION

56.  For all the reasons described above, there is probable cause to believe that VALENCIA committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Distribution of Cocaine) on April 6, 2023.

57.  Additionally, there is probable cause to believe that fruits, evidence, or instrumentalities of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES, on ESQUIVEL's person, and in the SUBJECT VEHICLES.

Attested to by the applicant in accordance with the
requirements of Fed. R. Crim. P. 4.1 by telephone on this the
10th day of May 2023.

HON. SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
May 2023.


_____
UNITED STATES MAGISTRATE JUDGE